Our next case is Digital Ally v. Utility Associates. Mr. Seitz, is that correct? Yes, it is. That's good. You may proceed. Thank you. May it please the Court. My name's Adam Seitz. I'm counsel here for Digital Ally. The issue that we are addressing today is the District Court's denial of the finding that there was no specific jurisdiction in our underlying declaratory judgment claim for non-infringement. We believe the District Court made two specific errors. They essentially roll into one error as I walk through them. The first error is that the District Court characterized utilities' contacts in Kansas as commercial and marketing in nature. We believe that those contacts certainly had some component of that but also included technical contacts in nature relating to how the product operated. The second error is that the District Court said that the contacts ultimately didn't matter in any event because utility did not own the 556 patent, the patent at issue, at the time that the contacts were made in Kansas. But the entire negotiation on the commercialization issue was to commercialize your products, right? There was a component of commercializing Digital Ally's products, yes. Another component was trying to integrate their products with our products. All this took place prior to utility obtaining the patent? That is correct. I understand this is a unique case with that timing and the aspect of the contacts. It's a very important element. I agree. I think the easiest way to wrap your head around it is to start with an understanding just very briefly of the 556 patent. I'm going to look at just one small aspect of the claims to help guide the So the 556 patent owned by utility relates to mobile surveillance or digital surveillance systems, an example of which would be a camera that might go on a rear view mirror in a police car or an emergency vehicle. It can capture audio, video, and other information. If you were to perform an infringement analysis on the claims of that patent, it requires more than merely just buying the product at Best Buy and looking at it or using it. It requires more than merely looking at the manuals for that product. It requires looking at the claims and analysis of the very technical details of how a product would operate. In some instances, potentially even the source code or software of that product. The claims require an analysis of how your audio and video information from your rear view mirror is being combined into a single data stream, how it's being sent wirelessly to a different location, and how it's being stored with different bits of metadata. So with that technical understanding for how you would perform an infringement analysis, you can look at the contacts and begin to see how they relate to our declaratory judgment actions. So the contacts... But how can the patent be implicated if utility didn't own the patent at the time these contacts were made? The patent would not have been implicated at the time that those contacts were made. I would agree with that. Our contention, however, is that they used the contacts that they made, contacts that related to utility-acquired Digital Allies source code, its software. It was reviewing, analyzing, testing, rewriting the software, our source code for our products. It was conducting testing on how it sends information. Examples of this is in the record at 381, 372 to 378. It was an iterative process over four or more months where they were testing our products, the very same products that are the subject of our declaratory judgment action. Now, the catch comes at that time there was no patent, and so they would not relate to the patent. I would agree with that. But the relationship fell apart at some point. And when the relationship fell apart, utility went out armed with the knowledge of exactly how, Digital Allies product knowledge. So if utility did not own the patent at the time that these discussions took place, wouldn't you say that those discussions were just commercialization in nature? At that time, yes. Okay. So what does our case law say in that regard? In the area of minimum contacts and personal jurisdiction, what does it say with respect to commercialization contacts? So commercialization contacts, the case law certainly says that those are not enough when you're looking at a declaratory judgment. Okay. So that's our case law. That is correct. That they're not enough. That is correct. What other contacts do you think give rise to jurisdiction? So, and I've not found a case with this situation here, Your Honor. We know from absent radio systems, we know that merely sending a letter is not enough. We know that there has to be something more. And what I'm saying is there were also letters sent to state officials of other states. That's right. The harm of which was felt in the state of Kansas. But what, do you have any cases that would support that, that you're making contacts with other states, that that gives rise to jurisdiction in, let's call it the home state, Kansas? Yes, Your Honor. In the case of Avocent, this court cited with approval to the U.S. Supreme Court case of Calder v. Jones, 465 U.S. 783, where you were having letters that were sent to a different forum, the harm of which was being felt in the home forum or where the lawsuit was going to be filed, where the Supreme Court said in that instance, the brunt of the harm is in the forum, even though the defendant never entered that forum. At the same time, though, our case log says that cease and desist letters alone are not good enough. I agree. I agree. And what I'm saying is that the cease and desist letters by themselves would not be enough. I agree. Avocent is very clear on that point. And commercialization efforts are not good enough by themselves. But what I believe, Your Honor, is that given the inferences that we're allowed to take at this context, the inferences that should be taken in Digital Allies' favor, that when you look at the contacts that were made, it is a very reasonable inference to assume that the utility took the information that it obtained exactly on how our product operated and used that as part of its infringement analysis to send these letters out. I didn't see your brief really try to come to grips with our opinion in radio systems versus accession, and not only the statements of law but really the facts, which seem to be a pretty close carbon copy of what's going on here. And, in fact, if anything, the fact there seems like it would make a more compelling case for specific jurisdiction over that declaratory judgment defendant. I think one of the biggest differences between radio systems in our case is here we are saying, and we think the inferences allow us to say, that the information obtained prior to when utility acquired the 556 patent, the information on how our products operate, those contacts in Kansas, is being used to make the allegations as part of its enforcement actions today. I think that's one of the biggest distinguishing facts that makes us unique and different from radio systems. But radio systems along the way, that inventor in New Jersey who came to Tennessee to try to strike up a joint business partnership, initially that inventor didn't have a patent, and then ultimately during the discussions he had a patent. So not only was he learning about the Tennessee company's products and internal components, but he also had a patent. And ultimately our court said, well, that's not good enough because what was going on there was an attempt to strike up a joint commercial effort. And again, what I did not see in radio systems was an explicit finding or inference from those facts that he was obtaining information that was necessary for, that he had to use for his infringement allegations or his enforcement actions later. And that's the difference that I believe exists in this case. The information that Utility obtained on our source code as part of obtaining our software, the tests that they did on how our product operates to send things wirelessly, I believe it's a reasonable inference to say that that is the key. On the other hand, a year elapsed from the time that those contacts were made to the time that you filed your declaratory action. How was Utility to know whether your technology remained the same or not? The products, that's a good question. So the products that they tested at that time that we see in the record are what's referred to as the DVM-500 and the DVM-750. Those were the exact same products that were still on sale, no changes as far as external looks would be, no changes as far as different software versions like you see in many products today when you have a different number product. They were the very same from the time they met with Digital in Kansas, conducted the tests and learned the information on how those products operated, and are the very same products that were listed in our declaratory judgment complaint. So our contention, and the key difference between radio systems, is that we believe that Utility, without the information that it learned through its contacts in Kansas, that they would not be able to complete the second prong of any infringement analysis, which is of course comparing the claims of the patent to the accused product. The reason we believe this, the reason we think this is a reasonable inference, is given the technical nature of those claims. Claims that require what we say is a much more in-depth technical knowledge of a product than merely looking at a manual. So we believe it's reasonable to infer that Utility used that technical knowledge from its contacts in Kansas as a basis for its enforcement actions. Do you think it's reasonable to infer that at the time of these conversations in 2011, that Utility had some secret plan in mind to acquire a patent a year and a half later? I think that's probably too far of a step to infer. But at the point that they acquired the patent, I think it is very reasonable to say that those previous commercialization efforts, I'm sorry, that would not be correct. At the point that they decided to use that information as part of their infringement study and their infringement allegations, that those previous commercial and marketing activities would then become enforcement activities, which could give rise to specific jurisdiction, because that was obtained through contacts in Kansas, all of which was initiated by Utility. So I understand the timing certainly is an issue there, and I agree that that is something that seems to align with radio systems, but given that we believe the inference should be that they took that information that they obtained while in Kansas and then used that as part of their infringement allegations, those marketing and commercialization efforts would now support a claim for specific jurisdiction. You're reserving four minutes of your time, correct? Yes, Your Honor. Mr. Moreland? Thank you, Your Honors. May it please the Court. My name is David Moreland, and I'm representing Appley Utility Associates, Inc. The basic premise here is the lower court got it right. On the issues that were properly before the court, they weighed the facts and applied the precedent to this court properly. It wasn't brought up in the discussion just now, but I will address it briefly because it is on the record in the briefs, and that's the issue of the promissory estoppel claim in the court below. That issue was never briefed before the lower court. It's not proper before this court, so I'll submit that, for one, the court shouldn't rely on that as a basis for specific jurisdiction, but I'll also say that even if it were properly before this court, the case law is very clear that unilateral acts of third parties, of other parties, cannot be the basis for specific jurisdiction. Here we have an unknown, unnamed third-party prospective patent, I guess prospective licensee of the patent, who is alleged to have done some act in the forum. But from a clear reading of case law, the relationship must arise out of contact that the defendant himself creates with the forum state. In a recent Supreme Court case, the Walden v. Fiore case in 2014, that is clear. So let's talk about the two categories of acts that we've discussed earlier. There's the sales letters that were sent by utility to the alleged customers of Digital Ally, and there's the contacts by utility with appellant before utility ever received the patent or acquired the patent. First, the letters themselves. This court has said that enforcement activities taking place outside the state cannot form the basis for specific jurisdiction. So I believe that the letters themselves shouldn't even be at issue in this particular analysis. They were not sent into the forum. Even if the effects are felt somewhere else? Yes, Your Honor. In the radio systems case, the effects presumably from sending or contacting the PTO relating to the patent, to a prospective patent and enforcing the patent in that case would have been felt in the forum. Yet this court said that the enforcement efforts there specifically were not contacts that should be taken into consideration. Is Calder v. Jones relevant here? Your Honor, I mean, the Calder v. Jones is discussed in Avocent, which is relied on by the court in radio systems for the proposition that these enforcement activities do not give rise to personal jurisdiction in the forum. To the extent that they relate at all and Calder could be applicable in the case, I think that they would be a very minuscule portion of the analysis. Obviously, if you're in the forum, this court has said you can't. Cease and desist letters in the forum even wouldn't be enough to raise a specific jurisdiction. So certainly if you're extending outside the forum, it's even less of a contact in the sense of a specific jurisdiction that would be more unfair, I suppose, to allow the cause of action to be raised based on those grounds. So I would contend that the letters themselves are not something that should even be a starting point for the discussion. But if they are, there's not something more that would be necessary to trigger specific jurisdiction, as this court has said that is required. If we talk about the activity that occurred prior to the patent being acquired by utility, Your Honor, as we were talking about earlier, this court has made clear that commercialization efforts in the forum are not enforcement acts that will give rise to specific jurisdiction. Normally when I see commercialization, you're talking about business activity and a move towards opening or creating business opportunities. Your opponent is saying that in the midst of these discussions, you had access to their source code. It was all focused on their technology. If you borrowed that technology or enhanced on it, why would that not give rise to jurisdiction? It wouldn't give rise to jurisdiction because the whole premise of that analysis is, in my view, an error. One, it's an error because any business relationship, and this is characterized by Digital Allies' declarations in the lower court as a proposed business relationship. Any business relationship, there's going to be some information exchanged between the parties. But if that's commercial information, then that's one thing. But if you're looking at the very core of a technology like source code, would that not be something else? I don't believe so because in the commercial context, and in this context specifically, the point of the proposed business relationship was to take a product that Digital Ally had and add a component that utility had. The two parties would come together, build a common product that would then be resold through Digital Allies' resellers. So I think in a common situation, you're going to have that type of information being exchanged. Then later on, you get that information. You get what you added and what Digital Ally contributed. You put it together, and now you're sending letters to customers, potential customers, to other states saying, watch out for the competitive product they may be infringing. Well, notably, the letters do not mention Digital Ally. They don't mention any of the products. There's no technical information related to Digital Ally. How many companies are involved in this technology? In this particular technology, I couldn't tell you offhand. I can certainly say there's more than just the two parties that are represented here, certainly in the technology that's at issue. But I couldn't give you an accurate count on how many. The letters were sent to states that were customers of Digital Ally, correct? If we accept the facts on their face, then that would be correct, as pled in the lower court by Digital Ally. And that's their allegation that those are their customers. But again, the letters themselves mention nothing about Digital Ally. They don't mention any products. So this goes to the second error that is the premise of the argument that Digital Ally is making, and it's that there was some nefarious conduct that was taking place at the time that Utility and Digital Ally were having discussions for this proposed business relationship in 2010 and 2011, that for some reason there was something, there was a motive that was all along, and this is all wild speculation, there's nothing in the records for this, that Utility all along had this motive that it would require this type of information. They may be asserting that, but really what they're trying to do is say, give us the opportunity to present this theory in court. And that's what's been denied them. They want the opportunity to get the declaratory action. Right, agreed. But to get to that point, the issue of force before the court is whether or not it's proper to bring that action in Kansas. But there's no facts that would support that it would be proper to bring that action in Kansas because there's been no threat of litigation in Kansas. There's been no enforcement efforts whatsoever in Kansas based on that patent. And the contacts that are being relied on occurred well over a year prior to the patent even being acquired by Utility. So there's just no, this court has said, there has to be a material relationship between the acts and the cause of action. Here we've got these tenuous random fortuitous acts, if you will, in the sense of the Supreme Court saying in Burger King those aren't allowed. These are the types of acts that are now being asserted as having a material relationship to the patent, and to the cause, excuse me, to the cause of action. And I'll also say the cause of action here is one of non-infringement. It's to clear the air of a wrongful allegation of infringement. I don't know how you can clear the air of a wrongful allegation of infringement if there's never been one made. So that alone, I guess, shows the disconnect between the cause of action and the acts that are being relied on to support that personal jurisdiction based on those causes, a specific jurisdiction here. One further step in this whole analysis is that there has to be some foresealed, let me back up, foreseeability is a linchpin of the personal jurisdiction analysis. I mean the Burger King Court, Supreme Court in Burger King said that there has to be reasonable foreseeability for the defendant to be held into the court in that jurisdiction based on the acts. Here, if we were to accept the facts, if we were to take the facts and say that specific jurisdiction could be drawn out of a point in time when the defendant here, utility, did not have the patent, it's impossible to have foreseeability that acts on a business relationship would somehow trigger a cause of action for non-infringement when it had never even acquired that patent. So the foreseeability, there's no foreseeability, I should say. It's just not there. It's impossible to have it. And again, so this goes back to, in a sense, wild speculation on the part of the appellant. And I'll submit that specific jurisdiction cannot be based on wild speculation, nor can it be based on continuous context. I don't have any further questions. Thank you very much. You have four minutes, Mr. Seitz. Thank you. Your Honor, I just want to point out a few things and then give the rest of my time to questions if there are any. You asked a question about the letters and some of the customers and allegations of infringement. I wanted to make sure you had a clear citation for the record. The letters that were sent to New York, there's emails from New York back to my client, Digital Allies, saying, is this you? Is this a problem with infringement? That's at A49. Were you the only customer to these states on this type of technology? Yes, I'm not certain I have that in the record, Your Honor, and I'm failing to draw a citation to it. If you look at the Heckman Declaration at A359, he talks about the length of their relationship and the amount of sales that they had made to Nebraska, for example, which included every product that Digital Allies sells for a very significant length of time. There's a declaration from a Captain Stern with the Verona Police Department at A419 who says they received a letter and the first thing they thought was that it was an allegation of infringement against Digital Ally. And then there's an email from Traverse City, Michigan at A410 where they reached out to Digital Ally and said we have received this letter. We can't continue an order with you because of these infringement allegations. And, Your Honor, I'm not asking for there to be some finding that this is nefarious conduct at this point. I would like the opportunity to try and prove that. But what we're saying at this point is that there is enough in the record to look and see that there were technical information that was exchanged during those meetings for a significant period of time and that in the context of a motion to dismiss, here for personal jurisdiction, it's a reasonable inference that can be taken in our favor that at the point that information was used, as part of the infringement allegations, it became enforcement activity that gives rise to specific jurisdiction. And the only other thing I have that I do want to raise on the estoppel issue, there's a case that I found that we failed to cite in our brief, specifically relating to whether you can impute the contacts of a predecessor corporation to a successor corporation for purposes of jurisdiction. That's Purdue Research Foundation v. Sanofi, 338F3D773. It's a Seventh Circuit case from 2003 where they cite the Fifth Circuit and Tenth Circuit cases saying several courts have recognized that the jurisdictional contacts of a predecessor corporation may be imputed to the successor corporation without offending due process. How? Privity? You would need to establish privity. I mean, it's a very fact-specific case. I didn't see you identify who the predecessor in interest was in this particular case. That's right, Your Honor. It was not something that we included as part of Mr. Heckman's declaration. We responded to what we thought was the non-infringement aspect. Do you know who it is? Yes, I do. It's Integrium Systems, one of the previous assignees in the assignment history. Are they in privity with utility? I don't have access to the information that utility has as far as the purchase agreement there, so that was not provided as part of any jurisdictional discovery at this point. And I have nothing further, so I'm happy to answer questions. Okay, thank you. I think we have that. That concludes today's arguments. This court stands in recess.